IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| CROSSROADS SYSTEMS, INC., | § | Case No. 17-51926 |
| | § | |
| Debtor. | § | |
| | § | |

**STATEMENT OF BACKGROUND INFORMATION AND DECLARATION OF JENNIFER CRANE, CHIEF FINANCIAL OFFICER OF CROSSROADS SYSTEMS, INC., IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST-DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Jennifer Crane, hereby submit this declaration (the "Declaration") under penalty of perjury:

1. I am the Chief Financial Officer of Crossroads Systems, Inc. ("Debtor"), a corporation organized under the laws of the state of Delaware and a debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). In such capacity, I am familiar with the Debtor's day-to-day operations and financial affairs.

**Introduction**

2. In order to obtain necessary and critical financing, (i) to avoid possible dissolution based on mounting administrative costs and certain liabilities; (ii) to effectuate its business plan of monetizing intellectual property and making acquisitions of profitable businesses to create long-term stockholder value, and (iii) to restructure its financial affairs, on August 13, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing the above captioned case (the "Chapter 11 Case"). The Debtor continues to manage and operate its business as a debtor-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

15554635_4           1

3. To minimize the adverse effects on its business, the Debtor has filed motions and pleadings seeking various types of "first day" relief (collectively, the "<u>First Day Motions</u>"). The First Day Motions seek relief to allow the Debtor to meet necessary obligations and fulfill its duties as a debtor-in-possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtor to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtor's business, and best serves the Debtor's estate and creditors' interests.

4. I am generally familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records and have served as the Debtor's Chief Financial Officer since November 2006. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtor's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtor's management and its advisors, or my opinion based on my experience, knowledge, and information concerning the Debtor's operations and financial condition. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5. This Declaration has been organized into four sections. The first provides background information on the Debtor's business. The second describes the Debtor's capital structure. The third describes the events leading up to the bankruptcy filing. The fourth section summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

I.  **The Debtor's Business and Operations**

6. Since its inception in 1996, the Debtor has been a prolific creator of intellectual property. As pioneers in data storage, the Debtor's engineers created some of the industry's most important breakthroughs, many of which are still utilized today by technology leaders. The patents that the Debtor authored are the result of investing heavily in research and development. This strategic focus resulted in the Debtor gaining unique and extensive knowledge of data storage and data management technologies. Therefore, protecting the Debtor's proprietary technology is vital to its business strategy. More than fifty (50) companies have licensed the Debtor's technology since 2000, and the Debtor has been paid more than $61 million for the right to use its inventions.

7. On March 22, 2016, the Debtor announced the sale of its product business and all related assets to Canadian-based StrongBox Data Solutions, Inc. ("SDSI") for gross proceeds of $1.9 million in Cash. Under the purchase agreement, the Debtor sold and transferred all of the assets related to the Debtor's product and support services division. Included in the transfer were assignments of ongoing contracts. In the event SDSI failed to perform such contracts, or its other assumed obligations under the purchase agreement, parties to such contracts or obligations could seek damages from the Debtor under certain circumstances. Depending on the claim for damages, the Debtor could have a claim for indemnification against SDSI pursuant to the purchase agreement. Any such indemnification claim would be subject to the provisions of the purchase agreement, as well as SDSI's ability to pay.

8. The Debtor generates revenue when companies using its technology agree to pay the Debtor either an upfront licensing fee or a combination of upfront fees and ongoing licensing fees for the use of the Debtor's intellectual property. The Debtor's licensing and litigation agreements sometimes include provisions to cross-license patents from other companies, further

enhancing the Debtor's intellectual property assets and product capabilities. The Debtor's intellectual property assets are identified in two distinct categories. The first category, known as the "'972 Patent" family, consists of patents and pending patents that are primarily concentrated around access controls. The second category, known as the "Non-'972 Patent" (and together with the 972 Patents, the "Patents") family, consists of patents and pending patents that are primarily directed to five product families: optimizing command processing, enabling interoperability, managing networks, enhancing tape libraries, and improving data systems.

9. On October 30, 2015, the Debtor entered into an agreement with TQ Zeta LLC, an affiliate of Techquity, and Intrepidus Holdings LLC (collectively, "Techquity") in which Techquity would share in the revenue generated from the '972 Patent litigation. In exchange for $10.0 million, Techquity received the rights to 52% of the first $20 million in license, settlement, or award proceeds from the '972 Patents, 40% of the proceeds between $20 and $100 million, and 12% of proceeds above $100 million. Under the terms of the agreement, the Debtor's use of proceeds was restricted to certain approved expenditures. On July 10, 2017, the Debtor received an early termination notice from Intrepidus Holdings LLC in connection with the agreement following receipt of notice from the Debtor of termination of its inter parties review proceedings. On July 12, 2017, the Debtor received an early termination notice from TQ Zeta in connection with the Agreement. Pursuant to the terms of the Agreement, the Debtor returned to each of Intrepidus and TQ Zeta the portion of funds allocated to such Investor of the aggregate remaining amount of $420,594.90. Following such full repayment by the Debtor to the Investors, the Agreement terminated.

10. On March 22, 2016, the Debtor announced that it, in partnership with Fortress Investment Group LLC ("Fortress"), signed an agreement with AQUA Licensing ("AQUA") to

market and sell the Non-'972 Patent portfolio. Under the terms of that Agreement, AQUA would receive a commission on any revenue realized from the Non-'972 Patent portfolio. The Debtor can provide no assurance regarding the timing or value of a transaction, or even if one will occur.

11. In connection with a loan from CF DB EZ LLC, an affiliate of Fortress Investment Group, the Non-'972 Patents were assigned to a limited partnership controlled by an affiliate of Fortress and were subject to a security interest granted to Fortress in connection with a secured credit agreement entered into with Fortress in July 2013 (the "Fortress Agreement"). Certain terms in the Fortress Agreement permit the Debtor to recover full control of the Non-'972 Patents in return for the payment of a monetization call option of up to $2 million dollars. The Debtor is evaluating strategic alternatives related to the Non-'972 Patent portfolio, including the possibility of exercising its rights in the Fortress Agreement to regain full control of the Non-'972 Patent. The Debtor fully paid off all debt obligations under the Fortress Agreement on October 30, 2015.

12. In November 2013, the Debtor hired a third-party patent consulting firm to analyze the Non-'972 Patents. The firm was paid a flat fee and tasked to provide an unbiased, fact-based professional opinion on the monetization potential of the portfolio. This firm determined that the 117 patent assets reviewed comprise 78 patent families, and the average remaining life on these patents at that time exceeded 10 years. Certain of the Non-'972 Patents likely apply to technology that complies with four industry standards. Because these industry standards are widely used, the Debtor believes that dozens of companies may have used, or may be using, the technology described in the Patents without authority or properly being licensed. The Debtor can provide no assurances regarding the accuracy of the assumptions underlying this analysis, its ability to recover any royalties or licensing fees relating to these Patents, or the timing for any such royalties or licensing fees.

13. In August 2014, the Debtor hired an intellectual property law firm to provide consulting services related to the Non-'972 Patent portfolio. The firm was asked to validate key assumptions, propose a detailed monetization strategy and timeline, identify potentially infringing companies and products, develop detailed claims charts, and estimate revenue opportunities associated with each potentially infringing company. The firm's work was completed in 2015.

14. The Debtor has not yet begun an active licensing program for the Non-'972 Patent family. Because the Debtor has not developed a licensing strategy, nor identified which potentially infringing companies to pursue, the Debtor has not created a budget for litigation or monetization of the Non-'972 Patent portfolio. In parallel with AQUA's efforts to market and sell the Non-'972 Patent portfolio, the Debtor will continue to evaluate alternative strategies.

15. In connection with monetizing the Patents, the Debtor is also pursuing a strategy of making acquisitions of profitable operations. For further information see the Debtor's Quarterly Report on Form 10-Q for the quarter ended April 30, 2017 attached to the Disclosure Statement.

16. Finally, the Debtor has U.S. federal income tax net operating loss carryovers ("NOLs") of approximately $139.7 million and research and experimentation credit carry-forwards of approximately $5.3 million, each as of December 31, 2016 (together with the NOLs, the "Tax Attributes"). The Debtor is operating its business in a manner that is intended to preserve these Tax Attributes for use in reducing future income tax liabilities.

## II. Current Assets and Capital Structure

17. As discussed, the Debtor's primary assets consist of the Cash, the Patents, and the Tax Attributes. As of April 30, 2017, the Debtor held approximately $3.8 million in assets, which were comprised largely of Cash and Cash equivalents and accounts receivable attributable to intellectual property licensing and royalty fees.

18. As of April 30, 2017, the Debtor had outstanding liabilities of approximately $1.2 million, which consisted largely of accounts payable, accrued expenses, and deferred revenue.

19. The Debtor also has unsecured debt obligations that it pays in the ordinary course. Most of the prepetition amounts related to these obligations were paid before filing. However, the Debtor will have ongoing obligations related to payroll, benefits, ordinary course professionals, and various vendors.

20. The Debtor has 2,591,257 shares issued and outstanding of Series F Convertible Preferred Stock, which will be cancelled pursuant to the Prepackaged Plan and exchanged for Cash and shares of New Common Stock. The Debtor has 1,225,472 shares issued and outstanding of common stock, which will be cancelled pursuant to the Prepackaged Plan, and an equivalent number of shares in New Common Stock will be re-issued to such Holders.

21. The Debtor also has Warrants/Options outstanding, which will be cancelled and such Warrant/Option Agreements will be rejected.

22. The Debtor is and may become involved in various lawsuits as well as other certain legal proceedings that have not been fully resolved and arise in the ordinary course of business. For example, as discussed above, the Debtor is involved in a number of litigation matters in an effort to protect and enforce its intellectual property rights. The current status of this litigation is discussed more fully in the Debtor's Quarterly Report on Form 10-Q for the quarter ended April 30, 2017 attached to the Disclosure Statement.

### III. Events Leading up to Bankruptcy

23. The Debtor has focused its efforts on (i) preserving Cash by reducing overhead expenses; and (ii) pursuing its strategy to monetize the Patents and make acquisitions designed to generate profit and positive cash flows, thus creating long-term stockholder value ("Strategy").

24. Before the Petition Date, in a vigorous effort to obtain funding to assist with its Strategy, the Debtor engaged in discussions with potential investors. Ultimately, 210 presented the most compelling offer as described herein whereby the Debtor can obtain the necessary funding to pursue its Strategy, preserve its Tax Attributes, pay all Creditor Claims in full, and maximize shareholder value.

25. In the absence of a restructuring or other satisfactory resolution of the Debtor's outstanding liabilities and obligations, the Debtor's liabilities and expenses will continue to increase and thereby decrease the likelihood that the Debtor will obtain future financing or capital investment and similarly reduce the amount of assets available for ultimate distribution to stakeholders. In the absence of further investment or other financing, the Debtor would likely proceed with a dissolution and distribute remaining assets in accordance with applicable law.

26. The Debtor has filed, with its Petition and Schedules, a Prepackaged Plan and Disclosure Statement, which, after Court approval, shall order the implementation of the terms of the RSAs allowing the Debtor to maximize its Strategy for the long-term benefit of its shareholders.

## IV. First Day Pleadings

27. Contemporaneously with the filing of this Declaration, the Debtor has filed a number of First Day Motions to minimize the adverse effects of the commencement of this Chapter 11 Case on its business, and to ensure that its restructuring goals can be implemented with limited disruptions. I have reviewed each of the First Day Motions and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11. I believe that the Debtor's estate will suffer immediate and irreparable harm if the Debtor does not obtain the relief requested

through the First Day Motions. A description of the First Day Motions, the relief sought therein, and the facts in support of the same is detailed below.

### A. Combined Hearing and Notice Motion

28. As part of the Debtor's First Day Motions, the Debtor filed the *Debtor's Emergency Motion for an Order (I) Combining the Hearing on the Joint Prepackaged Plan of the Debtor and the Disclosure Statement, (II) Approving Notices Related Thereto, and (III) Granting Related Relief* (the "Combined Hearing and Notice Motion"). The Combined Hearing and Notice Motion requests that the Court (a) set a combined hearing to consider approval of the adequacy of the Disclosure Statement and confirmation of the Prepackaged Plan (the "Combined Hearing"); (b) approve (i) the time fixed for filing objections to the adequacy of the Disclosure Statement and/or to confirmation of the Prepackaged Plan and (ii) the time, date, and place of the Combined Hearing; (c) approve the Combined Hearing Notice, substantially in the form attached to the Combined Hearing and Notice Motion as Exhibit A, Notice of Unimpaired Non-Voting Status substantially in the form attached to the Combined Hearing and Notice Motion as Exhibit B, and Publication Notice substantially in the form attached to the Combined Hearing and Notice Motion as Exhibit C; and (d) waive Bankruptcy Rule 1007(a)(3), requiring a list of equity security holders.

29. I believe the proposed notice is the most efficient method to provide notice to shareholders of the Combined Hearing and deadlines in this case.

### B. Trading Motion

30. As part of the Debtor's First Day Motions, the Debtor filed the *Debtor's Emergency Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities and for Related Relief (*the "Trading Motion").

31. Through the Trading Motion, the Debtor requests that this Court enter interim and final orders (a) establishing notification and hearing procedures regarding the trading of, or declarations of worthlessness for federal or state tax purposes with respect to, equity securities in the Debtor or of any beneficial interest therein (the common stock of Debtor and any beneficial interest therein, including Options and the convertible preferred stock of Debtor and any beneficial interest therein, including Options (as defined in Paragraph 11(e) of the Trading Motion) to acquire such stock, the "<u>Stock</u>" or the "<u>Equity Securities</u>") that must be complied with before trades or transfers of such securities or declarations of worthlessness become effective, (b) ordering that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to, Equity Securities in violation of the procedures set forth below shall be void *ab initio*, and (c) scheduling a final hearing (the "<u>Final Hearing</u>") on the Trading Motion.

32. As previously mentioned, the Debtor has valuable Tax Attributes that could translate into a significant potential future tax savings. A failure to preserve the Debtor's Tax Attributes could cause the Debtor's estate to suffer a significant tax liability to the detriment of stakeholder interests.

33. Given the significant benefit to the estate of preserving the Tax Attributes, I believe that cause exists to grant the relief requested immediately, ***on an interim basis pending this Court's entry of a Final Order***, and that such relief is in the best interests of the estate.

34. It is my understanding that under applicable tax laws, if transfers of the Debtor's Common Stock above the thresholds more fully described in the Trading Motion were to occur prior to the effective date of the Debtor's Chapter 11 plan, those transfers may trigger an "ownership change" under applicable law and thereby severely endanger the Debtor's ability to utilize its Tax Attributes and thus causing considerable damage to estate interests.

35. Granting the relief requested in the Trading Motion will preserve value for the Debtor's estate.

36. It is my understanding that the procedures requested by the Debtor in the Trading Motion would permit most stock trading and all claims to continue, subject to applicable law.

### C. Bar Date Motion

37. As part of the Debtor's First Day Motions, the Debtor filed the *Debtor's Emergency Motion for an Order (I) Authorizing the Mailing of Notices, (II) Establishing a Bar Date for Filing Proofs of Claim, (III) Establishing Ramifications for Failure to Timely File Claims, (IV) Approving Consolidated Notice of (A) Case Commencement and (B) Bar Date, and (V) Approving Notice Procedures (*the "Bar Date Motion").

38. With the Bar Date Motion, the Debtor seeks the entry of an order under Bankruptcy Code § 105(a): (i) authorizing the mailing of notices; (ii) establishing a bar date to file proofs of claims; (iii) establishing ramifications for the failure to comply with the bar date; (iv) approving a consolidated notice of (a) case commencement and (b) the bar date; and (v) approving notice procedures for this Chapter 11 Case.

39. The Debtor believes that the Bar Date Motion properly balances due process concerns with finality. The Debtor submits that, absent the relief granted in the Bar Date Motion, the Debtor and its estate could suffer irreparable harm.

40. The 210 RSA requires certain deadlines and if they are not met, there is a risk that the Debtor will not obtain the benefits of the 210 RSA, i.e., the financing required to implement its strategy to increase shareholder value. Considering the procedures the Debtor will be complying with to provide notice, the Debtor and its estate must be afforded the assurance of finality with respect to the claims against its estate.

### D. RSA Assumption Motion

41. As part of the Debtor's First Day Motions, the Debtor filed the *Debtor's Emergency Motion for an Order Authorizing the Assumption of Debtor's Restructuring Support Agreements* (the "RSA Assumption Motion").

42. Prior to the Petition Date, the Debtor executed (i) a restructuring support agreement (the "210 RSA") and a letter agreement (the "210 Letter") with 210/CRDS Investment LLC ("210") and (ii) a restructuring support agreement (the "Wolverine RSA", and together with the 210 RSA, the "RSAs") with Wolverine Flagship Fund Trading Limited ("Wolverine"). The 210 RSA is attached to the RSA Assumption Motion (discussed below) as Exhibit A, the 210 Letter is attached to the RSA Assumption Motion as Exhibit B and the Wolverine RSA is attached the Assumption Motion as Exhibit C. The 210 Letter and the 210 RSA are deemed executed contemporaneously and both constitute the complete agreement among the parties. Therefore, reference herein to the 210 RSA includes reference also to the 210 Letter. As more fully described in the RSAs and the Prepackaged Plan and Disclosure Statement, the Debtor is seeking to implement a restructuring of its business, obtain new capital, gain access to financing and relieve itself of certain other contractual obligations.

43. Pursuant to the 210 RSA, subject to the terms and conditions of a securities purchase agreement, 210 will invest $4 million in exchange for 49.49% of the Reorganized Debtor's New Common Stock. In addition, subject to the terms and conditions of a securities purchase agreement and loan agreement, 210 will provide the Reorganized Debtor up to $10 million in unsecured loans to finance acquisitions as the Reorganized Debtor implements its Strategy. Pursuant to the 210 RSA, the Debtor was required to file bankruptcy and confirm a plan of reorganization effectuating the terms of the 210 RSA. The proposed equity investment and

additional financing provide significant value to the Debtor and the Debtor's estate. In recognition that 210 has committed capital and incurred expenses, and will continue to incur expenses, associated with pursuing the proposed transactions in the 210 RSA, the Debtor has agreed to modest breakup protections in the amount of $500,000 under a limited set of conditions. The amount of the proposed breakup fee and expense reimbursement is consistent with 210's estimated out-of-pocket expenses to be incurred in connection with the bankruptcy filing and the consummation of the transactions contemplated in the RSA. One of the conditions to the enforceability of the RSA is that the Debtor file a motion to assume the RSA on or before August 14, 2017. If the RSA is not authorized by the Bankruptcy Court on or before August 23, 2017, 210 will not be obligated to consummate the transactions contemplated in the RSA

44. OTA, LLC ("OTA"), ACT Capital Management, LLP ("ACT"), and certain related ACT parties (collectively, the "Consenting Preferred Shareholders") all executed joinder agreements (collectively, the "Joinder Agreements") to the 210 RSA binding all Consenting Preferred Shareholders to the terms of the 210 RSA.

45. Pursuant to the Wolverine RSA, among other things, Wolverine agreed to vote in favor of the Prepackaged Plan so long as it contained the terms and conditions set forth in the 210 RSA. Further, pursuant to the Wolverine RSA, the Debtor agreed to pay for reasonable legal fees and expenses incurred by Wolverine with respect to the negotiation and execution of the Wolverine RSA.

46. One of the conditions to the enforceability of the 210 RSA is that the Debtor file a motion to assume the 210 RSA and obtain approval from the Bankruptcy Court no later than ten business days after the Petition Date. If the 210 RSA is not authorized by the Bankruptcy Court

within ten business days from the Petition Date, 210 will not be obligated to consummate the transactions contemplated in the 210 RSA.

47. I believe that the Debtor's decision to assume the RSA is a sound exercise of its business judgment. Through the 210 RSA, the Debtor will obtain much needed equity capital and access to a future financing source that will allow the Debtor to continue executing on its current patent monetization strategy and to continue to pursue other opportunities to the benefit of the Debtor, its creditors, and shareholders. The new capital and access to financing under the 210 RSA will benefit the Debtor and its entire estate.

### E. Motion to Reject Warrant/Option Agreements

48. As part of the Debtor's First Day Motions, the Debtor filed the *Debtor's Motion for an Order (i) Authorizing the Debtor to Reject Warrant/Option Agreements and (ii) Estimating Rejection Claims* (the "Motion to Reject").

49. With the Motion to Reject, the Debtor seeks the entry of an order under sections 105(a), 365, and 502(c) of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (i) authorizing the Debtor to reject the Warrant/Option Agreements and (ii) estimating the aggregate Rejection Claims for all purposes, including distribution, at no more than $23,665.09.

50. Under the circumstances, the Warrant/Option Agreements are burdensome executory contracts. The Debtor's decision to reject the Warrant/Option Agreements is in the best interest of the Debtor and is a sound exercise of its business judgment. As stated above, rejection of the Warrant/Option Agreements is required under the RSA. Through the RSA, the Debtor will obtain much-needed equity capital and access to a future financing source that will allow the Debtor to continue executing on its current patent monetization strategy and to continue to pursue

other opportunities for the benefit of the Debtor, its creditors, and shareholders. The new capital and access to financing under the RSA will benefit the Debtor and its entire estate. The unimpairment of the claims arising from rejection of the Warrant/Option Agreements ensures that these claims will be paid in full.

51. Absent rejection of the Warrant/Option Agreements, 210 has the right to terminate the RSA and refuse to support the Debtor's proposed restructuring, which may irreparably harm the Debtor's estate. Therefore, the Court should approve the Debtor's rejection of the Warrant/Option Agreements.

52. With respect to the Warrants/Options, there is no "amount due" to any holder under the respective Warrant/Option Agreements. Instead, the Debtor has an obligation to deliver a certain number of shares of common stock to a holder when and if the holder exercises its Warrant/Option and pays the appropriate exercise price. As demonstrated by the Roth Declaration attached to the Motion to Reject, the value of the unexercised Warrant/Option Agreements at any given time is calculated by using a complex, but well-established, financial model that takes into account a variety of factors and assumptions, including market price of the Debtor's common stock, exercise price of the Warrant/Option, price volatility, the time to maturity of the Warrant/Option, any dividend yield, and market interest rates. *See* Roth Decl. ¶ 7.

53. While the RSA and Prepackaged Plan provide that the Rejection Claims will be paid in full, the RSA and RSA Letter Agreement also provide that 210 will have a right to terminate the RSA (and its obligations thereunder) if the aggregate Rejection Claims exceed $40,000. As set forth in the Roth Declaration, the Debtor believes that aggregate Rejection Claims are less than this amount (a total of $23,665.09).

54. Estimation of the Rejections Claims, as requested in the Motion, will expedite administration of the Debtor's estate and confirm that the condition precedent under the RSA can be satisfied. On the other hand, failure to estimate the Rejection Claims will delay administration of the Debtor's estate and potentially provide 210 with a right to terminate the RSA and refuse to support the Debtor's proposed restructuring. In the Debtor's view, this would not only necessarily frustrate and prolong the Debtor's reorganization efforts but destroy enterprise value which is maximized as a result of the Prepackaged Plan. Therefore, the Court should estimate the Rejection Claims under section 502(c) of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing *Declaration of Jennifer Crane* is true and correct.

Dated: August 13, 2017

By: /s/ *Jennifer Crane*
Name: Jennifer Crane
Title: Chief Financial Officer
Crossroads Systems, Inc.